Daniel Z. Srourian
SROURIAN LAW FIRM
3435 Wilshire Boulevard, Suite 1710
Los Angeles, CA 90010
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
daniel@slfla.com

Patrick N. Keegan
KEEGAN AND BAKER LLP
2292 Faraday Avenue Suite 100
Carlsbad, CA 92009
Telephone: (760) 929-9303
Facsimile: (760) 929-9260
pkeegan@keeganbaker.com

[Additional Counsel on signature page]

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### EASTERN DIVISION

| | |
|---|---|
| RYAN COLLINS and NELSON QUILES, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONIFER VALUE-BASED CARE, LLC, CONIFER REVENUE CYCLE SOLUTIONS,<br><br>Defendants. | NO. ____5:24-cv-2265____<br><br>**CLASS ACTION COMPLAINT:**<br>**1. NEGLIGENCE;**<br>**2. INVASION OF PRIVACY;**<br>**3. UNJUST ENRICHMENT;**<br>**4. VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT;**<br>**5. UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§17200, ET SEQ; AND**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiffs Ryan Collins and Nelson Quiles ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Conifer Value-Based Care, LLC and Conifer Revenue Cycle Solutions, (collectively referred to as "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.    This consolidated class action arises from Defendants' failure to protect highly sensitive data, leading to a data breach in March 2022 and exposing the sensitive personal and medical information belonging to plaintiffs and thousands of other patients.

2.    Defendants are a collection of entities under Tenet Health Corporation (NYSE: THC), a diversified healthcare services company that collects, administers, and stores the healthcare records for millions of Americans, including the records of HIPPA covered entities across the country. This means that Defendants collect, administer, and store information and records not only on its own patients, but also patients that have never dealt with the company and do not know it has their information.

3.    Defendants collect and store this sensitive information, including the information at issue here, in coordination with two other Conifer entities, Tenet and Conifer Health Solutions LLC. Together, the four companies coordinate their data

CLASS ACTION COMPLAINT – 1

security efforts and efforts to notify patients and employees impacted by data breaches, as shown by Defendants' breach notices, which are all signed by the "Conifer Privacy Office" and originate from the same California office. In addition, Defendants base their operations in California with continuous and systematic contacts with the state.

4.    In collecting highly sensitive patient data on a vast scale, Defendants accepted duties to protect it under tort, contract, and statutory principles under California law. But despite accepting those duties, Conifer never implemented the security systems needed to fulfill them. This meant its security systems lacked the ability to prevent, detect, or stop data breaches from happening, allowing cybercriminals to access its systems for months undetected in two separate data breaches within two months.

5.    On March 21, 2022, Defendants discovered they had lost control over their consumers' highly sensitive personal information in a data breach perpetrated by cybercriminals with access to only a few email accounts. The number of total breach victims is unknown, but on information and belief, Defendants' data breach has impacted at least thousands of people, including patients and the current and former employees of Defendants' clients.

6.    The breach occurred between March 17, 2022, and March 22, 2022, when cybercriminals first accessed parts of Defendants' business email accounts through a phishing scam, and was not discovered by Defendants until March 21, 2022, four days later. Indeed, so inadequate was Defendants' cybersecurity that even

after discovery, Defendants were still unable to stop cybercriminals from their pilfering for another day.

7.    Defendants struggled to identify what information was involved in the data breach and whom it belonged to. After investigation, Defendants found it had exposed details like Plaintiffs' and the Class's Social Security numbers, names, dates of birth, medical treatment information, diagnoses and symptoms, their doctors, insurance information, and prescriptions.

8.    On or about October 11, 2022—seven months after the March 2022 data breach occurred and when Defendants first learned of the data breach—Defendants finally began notifying Class Members about the breach.

9.    Following internal investigations, Defendants learned cybercriminals gained unauthorized access to their consumers' personally identifiable information ("PII") and protected health information ("PHI") (collectively with PII, "Sensitive Information") during the data breach.

10.    But Defendants' breach notice only exacerbated the harm Defendants caused patients. This is because the notice obfuscated the nature of the breach and the threat it posed—refusing to tell their victims how many people were impacted, how the breach happened, or why it took the Defendants several months to begin notifying victims that hackers had gained access to their highly sensitive consumer information.

11.    Defendants' failure to timely detect and report the data breach ("Data Breach") made patients vulnerable to identity theft without any warnings to monitor

their financial accounts or credit reports to prevent unauthorized use of their Sensitive Information.

12.    Defendants knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Sensitive Information misuse.

13.    As above and relevant here, Defendants maintain continuous and systemic contacts with California such that this Court has general personal jurisdiction over them. The decisions leading to the Data Breach originated from this state, the Data Breach notice was sent from this state, and Defendants have previously declined to challenge this Court's jurisdiction over them in related California litigation. *See* Doc. 48 from *Morales v. Conifer Health Solutions LLC*, Case No. 2:23-cv-01987.

14.    In failing to adequately protect their patients' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendants violated state and federal law and harmed thousands of patients.

15.    Plaintiffs and members of the proposed Class are victims of Defendants' negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendants with their Sensitive Information. Defendants betrayed that trust. Defendants failed to properly use up-to-date security practices to prevent the Data Breach.

16.    Plaintiffs Ryan Collins and Nelson Quiles are Data Breach victims of the March 2022 data breach.

17.    Accordingly, Plaintiffs, on their own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit seeking injunctive relief, damages,

and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in Defendants' possession.

## PLAINTIFFS

18.    Plaintiff Ryan Collins is a natural person and citizen of Massachusetts, residing in Ashland, Massachusetts where he intends to remain. Mr. Collins is a March 2022 breach victim. Plaintiff Ryan Collins received Conifer Value-Based Care's notice letter, addressed in his first and last name with his residential address, dated October 11, 2022, entitled "Notice of Data Breach," signed "Zanib Arshed[,] Conifer Privacy Officer" an example of which is, attached as Exhibit A.

19.    Plaintiff Nelson Quiles is a natural person and citizen of Maryland, residing in Centreville, Maryland, where he intends to remain. Mr. Quiles is a March 2022 breach victim. Plaintiff Nelson Quiles received Conifer Value-Based Care's notice letter, addressed in his first and last name with his residential address, dated October 11, 2022, entitled "Notice of Data Breach," signed "Zanib Arshed[,] Conifer Privacy Officer."

## DEFENDANTS

20.    Defendant Conifer Value-Based Care, LLC is a Maryland LLC with its registered agent being at 330 N Brand Blvd., Glendale, CA. It can be served there. The sole member of Conifer Value-Based Care, LLC, is Conifer Health Solutions, LLC, a Delaware LLC. The members of Conifer Health Solutions, LLC are CommonSpirit Health and Conifer Holdings, Inc. CommonSpirit Health is a Colorado non-profit corporation with its principal place of business in Denver, Colorado. Conifer Holdings, Inc. is a Delaware corporation. Although Conifer

Value-Based Solutions has listed its "principal place of business" as located in Frisco, Texas, it maintains systematic and continuous contacts in California such that its principal place of business is in this state. Indeed, Conifer Value-Based Care's headquarters are located at 15821 Ventura Boulevard, Suite 600 Encino, CA 91436. Conifer Value-Based Care manages its operations from that location, including those leading to the incident at issue in this case.

21.    Defendant Conifer Revenue Cycle Solutions, LLC, is a "California limited liability company" and its sole member is Conifer Health Solutions, LLC. Defendant Conifer Revenue Cycle Solutions, LLC's sole member is Conifer Health Solutions, LLC, which is a Delaware limited liability company. Conifer Health Solutions, LLC has two members: CommonSpirit Health and Conifer Holdings, Inc. CommonSpirit Health is a Colorado nonprofit corporation with its principal place of business in Denver, Colorado. Conifer Holdings, Inc. is a Delaware corporation with its principal place of business in Frisco, Texas. At all times relevant to this action, Defendant Conifer Revenue Cycle Solutions, LLC was and is a business that conducts business primarily in California like Conifer Value-Based Care, although it is a citizen of other states.

**JURISDICTION & VENUE**

22.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d) because CAFA provides the Court with original jurisdiction of this action. Under CAFA, jurisdiction exits because the controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which plaintiffs, as citizens of Maryland and Massachusetts, are citizens of different states than Defendants.

CLASS ACTION COMPLAINT – 6

23.     This Court has general personal jurisdiction over Defendants because they regularly conduct business in California, maintain systemic and continuous business here, the decisions leading to the Data Breach were made here, the Data Breach notices plaintiffs received originated from here, meaning their principal places of business are located here. Conifer Revenue Cycle Solutions is also a California limited liability company.

24.     In addition, Defendants have previously declined to challenge this Court's personal jurisdiction over them in related litigation. *See* Doc. 48 from *Morales v. Conifer Health Solutions LLC*, Case No. 2:23-cv-01987.

25.     Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## BACKGROUND FACTS

***Defendants Collected and Stored the Sensitive Information of Plaintiffs and the Class***

***The Data Breach***

26.     Plaintiffs and victims of the Data Breach are unsure how Defendants got their information but assume that one of their employers was Defendants' clients and provided Defendants with their Sensitive Information.

27.     On information and belief, Defendants collect and maintain consumers' unencrypted Sensitive Information in their computer systems.

28.     In collecting and maintaining Sensitive Information, Defendants implicitly agree they will safeguard the data using reasonable means according to their internal policies and federal law.

29.     According to the Breach Notice, Conifer Value-Based Care, LLC "discovered that an unauthorized third party gained access to certain Microsoft Office 365-hosted business email accounts through phishing" on March 21, 2022. An internal investigation revealed that an unauthorized actor had gained access to portions of Conifer Value-Based Care's email accounts between March 17, 2022, and March 22, 2022.

30.     In other words, Defendants' investigation revealed that their network had been hacked by cybercriminals and that Defendants' inadequate cyber and data security systems and measures allowed those responsible for the cyberattack to obtain files containing a treasure trove of thousands of their consumers' personal, private, and sensitive information, including but not limited to full names, home address, date of birth, Social Security number, health insurance subscriber number, medication information including diagnosis and treatment information, and health billings and claims information.

31.     Through their inadequate security practices, Defendants exposed Plaintiffs' and the Class's Sensitive Information to theft and sale on the dark web.

32.     On or about October 11, 2022—seven months after the Data Breach occurred—Defendants finally notified Plaintiffs and Class Members about the Data Breach. That notice came from Defendants' California "Conifer Privacy Office" under Conifer Health Solutions LLC's letterhead—evidencing how Conifer's entities coordinate data security efforts.

33.     Indeed, Defendants coordinated their data security decisions from California, including from its offices in Encino, California, the primary decisions

leading to Defendants' data security failures occurred in this state, and Defendants' breach response took place primarily in this state.

34.    Despite their duties and alleged commitments to safeguard Sensitive Information, Defendants do not follow industry standard practices in securing consumers' Sensitive Information, as evidenced by the Data Breach and stolen Sensitive Information.

35.    In response to the Data Breach, Conifer contends it "has and continues to enhance its security controls and monitoring practices as appropriate" and "accelerated its implementation of multi-factor authentication for all business email accounts within the environment." Although Defendants fail to expand on these alleged "security controls and monitoring practices," such actions, as well as multi-factor authentication, should have been in place *before* the Data Breach.

36.    Through the Breach Notice, Defendants also recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to "carefully review credit reports and statements sent from providers as well as your insurance company" to avoid "unauthorized transactions" as well as "incidents of identity theft or fraud."

37.    Defendants further recognized through the Breach Notice, their duty to implement reasonable cybersecurity safeguards or policies to protect their consumers' Sensitive Information, insisting that "Conifer takes privacy and security very seriously" and "sincerely regrets that this incident occurred[.]'"

38.    On information and belief, Defendants have offered several months of complimentary credit monitoring services to victims, which does not adequately

address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves Sensitive Information that cannot be changed, such as Social Security numbers. Further, the breach exposed consumers' nonpublic, highly private information, a disturbing harm in and of itself.

39.    Even with complimentary credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' Sensitive Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

40.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's Sensitive Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

41.    On information and belief, Defendants failed to adequately train their IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing Defendants to lose control over their consumers' Sensitive Information. Defendants' negligence is evidenced by their failure to prevent multiple Data Breaches occurring mere months apart and stop cybercriminals from repeatedly accessing their consumers' Sensitive Information. Further, the Breach Notice makes clear that Defendants cannot, or will not, determine the full scope of the Data Breach.

42.    Indeed, Defendants' negligence is only further shown by the fact that the March 2022 breach was the second in two months caused by Conifer.[1]

43.    Although discovered after the Data Breach that is the subject of this complaint, an internal investigation revealed that Conifer discovered a separate breach in April that had begun as early as January 20, 2022, and impacted thousands of current and former patients of Conifer's clients.

***The Data Breach was a Foreseeable Risk of which Defendants were on Notice.***

44.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare and healthcare adjacent industry preceding the date of the breach.

45.    In light of recent high profile data breaches at other healthcare partner and provider companies, Defendants knew or should have known that their electronic records and consumers' Sensitive Information would be targeted by cybercriminals. In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[2]

---

[1] When 2+2 = OMG: two hospitals, two breaches each, both discovered in the same month, Databreaches, https://www.databreaches.net/when-22-omg-two-hospitals-two-breaches-each-both-discovered-in-same-month/ (last visited December 14, 2023).

[2] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_

2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed 12-10-2020).

46.    Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry, including Defendants.

47.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[3] The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[4]

48.    Indeed, cyberattacks against Defendants' industry have become increasingly common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime." [5]

49.    Cyberattacks on medical systems and healthcare partner and provider companies like Defendants have become so notorious that the FBI and U.S. Secret

---

[3]    2021    Data    Breach    Annual    Report,    ITRC,    chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf (last    visited June 13, 2023).
[4] *Id.*
[5]    Gordon M. Snow Statement, FBI https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited June 13, 2023).

Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[6]

50.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

***Plaintiff Collins' Experience***

51.    Plaintiff Collins is a Data Breach victim of the Data Breach. He is unsure why Defendants are in possession of his Sensitive Information but assumed it was provided by his employer, Breezeline, one of Defendants' clients who utilizes Defendants' services to assist with health plans.

52.    Regardless, Defendants obtained and continues to maintain Plaintiff Collins' Sensitive Information and has a continuing legal duty and obligation to protect that Sensitive Information from unauthorized access and disclosure.

53.    Defendants deprived Plaintiff Collins of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it seven months after Defendants finally discovered the Data Breach.

54.    As a result of their inadequate cybersecurity, Defendants exposed Plaintiff Collins' Sensitive Information for theft by cybercriminals and sale on the dark web.

---

[6] Secret Service Warn of Targeted, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware(last visited June 13, 2023).

55. Plaintiff Collins suffered actual injury from the exposure of his Sensitive Information —which violates his rights to privacy.

56. Plaintiff Collins suffered actual injury in the form of damages to and diminution in the value of his Sensitive Information. After all, Sensitive Information is a form of intangible property—property that Defendants were required to adequately protect.

57. As a result of the Data Breach and the recommendations of Defendants' Notice, Plaintiff Collins has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, and monitoring his credit information as suggested by Defendant.

58. Plaintiff Collins has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what Sensitive Information was exposed in the Data Breach. Plaintiff Collins has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

59. Plaintiff Collins is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Sensitive Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendants' delay in informing Plaintiff Collins and Class Members about the Data Breach.

60.     In fact, following the Data Breach, Plaintiff Collins has started receiving spam calls and texts, suggesting that Plaintiff Collins' information has been stolen and placed in the hands of cybercriminals.

61.     Plaintiff Collins has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Quiles' Experience***

62.     Plaintiff Quiles is a Data Breach victim of the Data Breach. He is unsure why Defendants are in possession of his Sensitive Information but assumed it was provided by his employer, one of Defendants' clients who utilizes Defendants services to assist with health plans.

63.     Regardless, Defendants obtained and continues to maintain Plaintiff Quiles' Sensitive Information and has a continuing legal duty and obligation to protect that Sensitive Information from unauthorized access and disclosure.

64.     Defendants deprived Plaintiff Quiles of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for seven months after Defendants finally discovered the Data Breach.

65.     Plaintiff Quiles suffered actual injury from the exposure of his Sensitive Information —which violates his rights to privacy.

66.     Plaintiff Quiles suffered actual injury in the form of damages to and diminution in the value of his Sensitive Information. After all, Sensitive Information is a form of intangible property—property that Defendants were required to adequately protect.

CLASS ACTION COMPLAINT – 15

67. Plaintiff Quiles does not recall ever learning that his Sensitive Information was compromised in a data breach incident, other than the breach at issue in this case.

68. As a result of the Data Breach and the recommendations of Defendants' Notice, Plaintiff Quiles has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information as suggested by Defendant.

69. Plaintiff Quiles has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff Quiles fears for his personal financial security and uncertainty over what Sensitive Information was exposed in the Data Breach. Plaintiff Quiles has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

70. Plaintiff Quiles is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Sensitive Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendants' delay in informing Plaintiff Quiles and Class Members about the Data Breach.

71.    Indeed, following the Data Breach, between April and May 2022, Plaintiff Quiles suffered a fraudulent charge of over $500 from Instacart on his Bank of America card that he did not authorize nor recognize.

72.    Plaintiff Quiles has also suffered numerous inquiries on his credit report that he does not recognize or authorize.

73.    Finally, following the Data Breach, Plaintiff Quiles has begun receiving significant amounts of spam calls and texts.

74.    Plaintiff Quiles has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

75.    Plaintiffs and members of the proposed Class have suffered injury from the misuse of their Sensitive Information that can be directly traced to Defendants.

76.    The ramifications of Defendants' failure to keep Plaintiffs' and the Class's Sensitive Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, or other nonpublic financial information, without permission, to commit fraud or other crimes.

77.    The types of Sensitive Information compromised and potentially stolen in the Data Breach is highly valuable to identity thieves. The stolen Sensitive Information can be used to gain access to a variety of existing accounts and websites to drain assets, bank accounts or open phony credit cards.

CLASS ACTION COMPLAINT – 17

78.    Identity thieves can also use this data to harm Plaintiffs and Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health- related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

79.    As a result of Defendants' failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.    The loss of the opportunity to control how their Sensitive Information is used;

b.  The diminution in value of their Sensitive Information;

c.  The compromise and continuing publication of their Sensitive Information;

d.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breaches, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.  Delay in receipt of tax refund monies;

g.  Unauthorized use of stolen Sensitive Information; and

h.  The continued risk to their Sensitive Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Sensitive Information in their possession.

80.  Stolen Sensitive Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.[7]

---

[7] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 7, 2023).

CLASS ACTION COMPLAINT – 19

81.     The value of Plaintiffs' and the proposed Class's Sensitive Information on the black market is considerable. Stolen Sensitive Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

82.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

83.     Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

84.     It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers

are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

85.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [8] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[9]

86.    The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[10]

---

[8] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[9] *Id.*
[10] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

87.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[11] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[12]

88.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

89.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

90.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social

---

[11] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[12] *See* https://www.investopedia.com/terms/s/ssn.asp

[13] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

91.   Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[14]

92.   It can take victims years to spot identity or PII and PHI theft, giving criminals plenty of time to use that information for cash.

---

[14] *See* https://oag.ca.gov/idtheft/facts/your-ssn

93.    One such example of criminals using Sensitive Information for profit is the development of "Fullz" packages.

94.    Cyber-criminals can cross-reference two sources of Sensitive Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.[15]

95.    The development of "Fullz" packages means that stolen Sensitive Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Sensitive Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and the proposed Class's stolen Sensitive Information is being misused, and that such misuse is fairly traceable to the Data Breach.

96.    Defendants disclosed the Sensitive Information of Plaintiffs and the Class for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the Sensitive Information of Plaintiffs and members of the proposed Class to people engaged in disruptive and unlawful

---

[15] *Id.*

business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen Sensitive Information.

97.    Defendants' use of outdated and insecure computer systems and software that are easy to hack, and their failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the Sensitive Information of Plaintiffs and members of the proposed Class to unscrupulous operators, con artists, and criminals.

98.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[16]

99.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[17,18]

100.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[19]

101.    As a result of the Data Breach, Plaintiffs' and Class Members' Sensitive Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs

---

[16] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/
[17] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[18] https://datacoup.com/
[19] https://digi.me/what-is-digime/

or Class Members for their property, resulting in an economic loss. Moreover, the Sensitive Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

102.    Defendants' failure to properly notify Plaintiffs and members of the proposed Class of the Data Breach exacerbated Plaintiffs' and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Sensitive Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### Defendants Failed to Adhere to FTC Guidelines

103.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[20] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendants, should employ to protect against the unlawful exposure of Sensitive Information.

104. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[21] The guidelines explain that businesses should:

---

[20] Federal Trade Commission, *Start With Security*, (https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) viewed 9-9-2021.

[21] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, (https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf) viewed 9-9-2021.

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

105. The FTC publication, *Protecting Personal Information: A Guide for Business*, also recommends that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

106. The FTC further recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures. [22]

107. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[22] Federal Trade Commission, *Start With Security*, (https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) viewed 9-9-2021.

108.   Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' Sensitive Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

109.   Defendants were at all times fully aware of their obligations to protect Plaintiffs and Class Members' Sensitive Information. Defendants were also aware of the significant repercussions that would result from its failure to do so.

**_Defendants Violated HIPAA_**

110.   HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

111.   Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

112.   Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Sensitive Information like the data Defendants left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

113.   Data Breaches such as the one Defendants experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

114.   A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40.

115.   Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

***Plaintiffs and Class Members Suffered Damages***

116.   The compromised and stolen information of Plaintiffs and Class members is private and sensitive in nature and was left inadequately protected by Defendants. Defendants did not obtain Plaintiffs' and Class members' consent to disclose this data to any other person as required by applicable law and industry standards.

117.   The data breaches was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class members' Sensitive Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including the failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' sensitive personal information to protect against reasonably foreseeable threats to the security or integrity of such information.

CLASS ACTION COMPLAINT – 29

118.   Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and the Class Members' Sensitive Information.

119.   As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the data breaches on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.

120.   Defendants' wrongful actions and inaction directly and proximately caused the potential theft and dissemination into the public domain of Plaintiffs' and Class members' Sensitive Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.     theft of their personal and financial information;

b.     unauthorized charges on their debit and credit card accounts;

c.    the actual, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and personal information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class members' information on the Internet's black market;

d.    the untimely and inadequate notification of the Data Breach;

e.    the improper disclosure of their Sensitive Information;

f.    loss of privacy;

g.    ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

h.    ascertainable losses in the form of deprivation of the value of their Sensitive Information, for which there is a well-established national and international market;

i.    ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

j.    loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and

CLASS ACTION COMPLAINT – 31

k.      the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

***Defendants Failed to Follow Industry Standards***

121.   A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendants' cybersecurity practices.

122.   Several best practices have been identified that—at a minimum— should be implemented by businesses like Defendants. Best cybersecurity practices that are standard in the industry providing "administrative services to healthcare providers," include implementation of multi-factor authentication for business email accounts; engaging independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audit; installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Other

industry standards best practices include: encryption (making data unreadable without a key); educating all employees and subjecting employees to regular phishing tests; requiring employees to use strong passwords and to regularly change passwords; and limiting which employees can access Sensitive Data.

123.    Defendants failed to meet the minimum standards of any of the following frameworks in effect at the time of the Data Breach: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

124.    These frameworks are applicable and accepted industry standards, and by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

125.    Defendants breached their obligations to Plaintiffs and the Class and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard PII and PHI on its computer systems and networks. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect PII and PHI of current and former customers;

c.    Failing to adequately protect current and former customers' PII and PHI by implementation of multi-factor authentication for business email accounts;

d.    Failing to adequately protect current and former customers' PII and PHI by engaging independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audit;

e.    Failing to properly monitor its own data security systems for existing intrusions, brute-force attempts, and clearing of event logs;

f.    Failing to apply all available security updates;

g.    Failing to install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

h.    Failing to practice the principle of least-privilege and maintain credential hygiene;

i.    Failing to avoid the use of domain-wide, administrator-level service accounts;

j.    Failing to employ or enforce the use of strong randomized, just-in- time local administrator passwords; and

k.    Failing to properly train and supervise employees in the proper handling of inbound emails.

126.    As the result of computer systems in need of security upgrading and inadequate procedures for handling cybersecurity threats, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and the Class's PII and/or PHI.

CLASS ACTION COMPLAINT – 34

**CLASS ACTION ALLEGATIONS**

127.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all members of the proposed class, defined as follows:

> **Nationwide Class:** All persons residing in the United States whose Sensitive Information was compromised in the Data Breach, including all those who received Defendants' breach notice.

128.   The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which the Defendants or their parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

129.   Plaintiffs reserve the right to amend the Class definition or add a Class if further information and discovery indicate that other classes should be added and if the definition of the Class should be narrowed, expanded, or otherwise modified.

130.   Plaintiffs and members of the Class satisfy the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23:

> a.     **Numerosity**. The exact number of Class members is unknown but is estimated to be up to thousands of consumers at this time, and individual

joinder in this case is impracticable. Class Members can be easily identified through Defendants' records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, unlawful trade practices, and class action controversies;

b.  **Typicality**: Plaintiffs' claims are typical of the claims of other Class members in that Plaintiffs, and the Class Members sustained damages arising out of the Data Breaches, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiffs and the Class Members sustained similar injuries and damages, as a result of Defendants' uniform illegal conduct;

c.  **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiffs have no interests that conflict with, or are antagonistic to those of, the Classe and Defendants have no defenses unique to Plaintiffs.

d.  **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

i.      Whether Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Sensitive Information;

ii.     Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii.    Whether Defendants were negligent in maintaining, protecting, and securing Sensitive Information;

iv.     Whether Defendants breached contract promises to safeguard Plaintiffs' and the Class's Sensitive Information;

v.      Whether Defendants took reasonable measures to determine the extent of the Data Breach after discovering them;

vi.     Whether Defendants' Breach Notice was reasonable;

vii.    Whether the Data Breach caused Plaintiffs and the Class injuries;

viii.   What the proper damages measure is; and

ix.     Whether Plaintiffs and the Class are entitled to damages, treble damages, or injunctive relief.

e. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants'

actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

## CAUSES OF ACTION

### First Claim for Relief
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

131.   Plaintiffs and the members of the Nationwide Class incorporate the above allegations as if fully set forth herein.

132.   Plaintiffs and members of the Class entrusted their Sensitive Information to Defendants. Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care in safeguarding and protecting their Sensitive Information and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Defendants' security systems to ensure the Sensitive Information of Plaintiffs and the Class was adequately secured and protected,

including using encryption technologies. Defendants further had a duty to implement processes that would detect a breach of their security system in a timely manner.

133.   Defendants were under an independent duty to act with reasonable care when they undertook to collect, create, and store Plaintiffs' and the Class's sensitive data on their computer system, fully aware–as any reasonable entity of their size would be–of the prevalence of data breaches and the resulting harm such a breach would cause. The recognition of Defendants' duty to act reasonably in this context is consistent with, *inter alia*, the Restatement (Second) of Torts § 302B (1965), which recounts a basic principle: an act or omission may be negligent if the actor realizes or should realize it involves an unreasonable risk of harm to another, even if the harm occurs through the criminal acts of a third party.

134.   Defendants knew that the PII and PHI of Plaintiffs and the Class was personal and sensitive information that is valuable to identity thieves and other criminals. Defendants also knew of the serious harm that could happen if the Sensitive Information of Plaintiffs and the Class was wrongfully disclosed.

135.   By being entrusted by Plaintiffs and the Class to safeguard their Sensitive Information, Defendants have a special relationship with Plaintiffs and the Class. Plaintiffs and the Class agreed to provide their Sensitive Information with the understanding that Defendants would take appropriate measures to protect it and would inform Plaintiffs and the Class of any security concerns that might call for action by Plaintiffs and the Class. Defendant was in an exclusive position to safeguard Plaintiffs' Sensitive Information and Plaintiffs had no way to verify or influence Defendant's data security posture.

136.    Defendants breached their duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Class members' Sensitive Information by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite failures and intrusions, and allowing unauthorized access to Plaintiffs' and the other Class member's Sensitive Information.

137.    But for Defendants' wrongful and negligent breach of the duties they owed to Plaintiffs and the Class, their Sensitive Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the personal data of Plaintiffs and the Class and all resulting damages.

138.    The injury and harm suffered by Plaintiffs and the Class members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class members' Sensitive Information. Defendants knew their systems and technologies for processing and securing the Sensitive Information of Plaintiffs and the Class had numerous security vulnerabilities.

139.    As a result of this misconduct by Defendants, the Sensitive Information of Plaintiffs and the Class were compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their Sensitive Information was disclosed to third parties without their consent. Plaintiffs and Class members also suffered diminution in value of their Sensitive Information in that it is now easily available to hackers on the Dark Web. Plaintiffs and the Class have also suffered

consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

140.    Plaintiffs also allege negligence under a second, negligence per se, theory.

141.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants have a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Sensitive Information.

142.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, the Sensitive Information of their consumers. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the members of the Class's Sensitive Information.

143.    Defendants breached their duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Sensitive Information.

144.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their consumers, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendants were in a position to ensure that their

CLASS ACTION COMPLAINT – 41

systems were sufficient to protect against the foreseeable risk of harm to Class Members from the Data Breach.

145.   Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

146.   Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Sensitive Information.

147.   Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and the Class's Sensitive Information and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Sensitive Information Defendants collected and stored and the foreseeable consequences of a data breaches, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

148.   The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against

businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

149. Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of Sensitive Information Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

150. But for Defendants' wrongful and negligent breach of the duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

151. The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their Sensitive Information.

152. Had Plaintiffs and the Class known that Defendants did not adequately protect their Sensitive Information, Plaintiffs and members of the Class would not have entrusted Defendants with their Sensitive Information.

153. Defendants' various violations and their failure to comply with applicable laws and regulations constitute negligence *per se*.

154.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of Sensitive Information; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen Sensitive Information, entitling them to damages in an amount to be proven at trial.

155.   Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their Sensitive Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their Sensitive Information in their continued possession.

### Second Claim for Relief
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Nationwide Class)**

156.   Plaintiffs and the members of the Class incorporate the above allegations as if fully set forth herein.

157.   Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Sensitive Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

158.   Defendants owed a duty to Plaintiffs and Class Member to keep their Sensitive Information confidential.

CLASS ACTION COMPLAINT – 44

159. The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Sensitive Information is highly offensive to a reasonable person.

160. Defendants' reckless and negligent failure to protect Plaintiffs' and Class Members' Sensitive Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person. Defendants' failure to protect Plaintiffs' and Class Members' Sensitive Information acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

161. Defendants knowingly did not notify Plaintiffs' and Class Members in a timely fashion about the Data Breach.

162. Because Defendants failed to properly safeguard Plaintiffs' and Class Members' Sensitive Information, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

163. As a proximate result of Defendants' acts and omissions, the private Sensitive Information of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

164. Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Sensitive Information is still maintained by Defendants with their inadequate cybersecurity system and policies.

165.   Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the Sensitive Information of Plaintiffs and the Class.

166.   Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of themselves and Class Members' Sensitive Information.

167.   Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

### Third Claim for Relief
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

168.   Plaintiffs and the members of the Class incorporate the above allegations as if fully set forth herein.

169.   Plaintiffs and Class Members conferred a monetary benefit on Defendants when Defendants' clients provided Plaintiffs' and Class Members' Sensitive Information to Defendants, which Defendants collected.

170.   Defendants also accepted payment and other monetary benefits from Defendants' clients, who in turn passed the cost of Defendant's services on to Plaintiffs and Class Members, directly or indirectly.

171.   Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Sensitive Information.

172.   Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and the Class, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

173.   Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

174.   Defendants acquired the monetary benefit and Sensitive Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged. If Plaintiffs and Class Members knew that Defendants had not secured their Sensitive Information, they would not have agreed to have their Sensitive Information provided to Defendants.

175.   Plaintiffs and Class Members have no adequate remedy at law.

176.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) the loss of the opportunity how their Sensitive Information is used; (ii) the compromise, publication, and/or theft of their Sensitive Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from

identity theft, and/or unauthorized use of their Sensitive Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Sensitive Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Sensitive Information in their continued possession and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Sensitive Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

177.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

178.   Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

**<u>Fourth Claim for Relief</u>**
**Violation of the California Confidentiality of Medical Information Act ("CMIA") Cal. Civ. Code § 56, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class)**

179.   Plaintiffs incorporate the above allegations as if fully set forth herein.

180.    Each of the Defendants are an "entity who has negligently released confidential information or records" concerning Plaintiffs in violation of Civil Code § 56.36.

181.    At all times relevant to this action, Conifer Revenue Cycle Solutions, LLC provided "revenue cycle management and other administrative services clients and received and maintained, and continues to maintain, "medical information,"[23] within the meaning of subdivision (j) of Cal. Civil Code section 56.05 of Plaintiffs and Class Members who are "patients," within the meaning of subdivision (m) of Cal. Civil Code section 56.05.

182.    As a company "furnishing administrative services" to healthcare providers within the definition of subdivision (a) of Cal. Civil Code section 56.26, Conifer Revenue Cycle Solutions, LLC was under a duty to protect and maintain the confidentiality of the medical information regarding patients, and to ensure that medical information regarding Plaintiffs and the Class is not disclosed or disseminated or released without their authorization.[24]

183.    At all times relevant to this action, including the period prior to and on March 21, 2022, Defendants negligently failed to establish appropriate procedures to ensure the confidentiality and protection from unauthorized use and disclosure of that information, as required by Cal. Civil Code section 56.26, and negligently failed to protect and preserve confidentiality of Plaintiffs' and the Class Members' medical information in its possession against unauthorized disclosure

and/or release, including, but not limited to, by failing to implement adequate and reasonable security controls and user authorization and authentication processes, by failing to implement multi-factor authentication for business email accounts, by failing to limit the types of data permitted to be transferred, by failing to encrypt or de-identify Plaintiffs' and Class Members' "medical information," within the meaning of subdivision (i) of Cal. Civil Code section 56.05, by maintaining Plaintiffs' and Class Members' "medical information," within the meaning of subdivision (i) of Cal. Civil Code section 56.05, for longer than is reasonably necessary, by failing to have adequate privacy policies and procedures in place, as required by the CMIA, under subdivision (a) of Cal. Civil Code section 56.26 and subparagraph (E) of paragraph (2) of subdivision (e) of Cal. Civil Code section 56.36, and by failing to properly and adequately educate and train its employees.

184.    Defendants knew, or should have known, that their computer systems and data security practices were inadequate to safeguard Plaintiffs and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, maintained in a nonencrypted and a nonredacted format, on Defendants' computer network and in "a single email account," from an unauthorized access and exfiltration, theft, or disclosure, and that such risk of an unauthorized access and exfiltration, theft, or disclosure was more likely than not. Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, maintained on Defendants' computer network and in "a single email

account," by *inter alia* failing to encrypt Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, so in the event of an unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, could not be read by an unauthorized third party.

185.    Had Defendants taken appropriate preventive actions, implemented multi-factor authentication for business email accounts, encrypted Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, and fix the deficiencies in their policies and procedures, as required by the CMIA, before March 21, 2022, Defendants could have prevented Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, from being "accessed" by and disclosed to and actually viewed by "the unauthorized party" (who is not identified by Conifer Revenue Cycle Solutions, LLC) "on March 21, 2022."

186.    Because Defendants failed to take appropriate preventive actions, failed to implement multi-factor authentication for business email accounts, failed to encrypt Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, and failed to fix the deficiencies in their policies and procedures, as required by the CMIA, before March 21, 2022, Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, in "a single email account" was "accessed" by and disclosed to and actually viewed by "the unauthorized party" (who is not identified by Defendants) "on March 21, 2022," without first obtaining an

authorization, constituting a disclosure and a release in violation of Cal. Civil Code section 56.26 of the CMIA.

187.    As a direct and proximate result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs and Class Members have and will continue to suffer damages as alleged herein, in amounts according to proof at trial.

188.    As a direct and proximate result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs and Class Members are entitled to recover "compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorney's fees not to exceed one thousand dollars ($1,000), and the costs of litigation" under Cal. Civil Code section 56.35.

189.    As a result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs and Class Members seek compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorney's fees not to exceed one thousand dollars ($1,000), and the costs of litigation according to proof under Cal. Civil Code section 56.35.

190.    As a result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs Ryan Collins and Nelson Quiles, individually, and on behalf of the Class, seek nominal damages of one thousand dollars ($1,000) for each violation under paragraph (1) of subdivision (b) of Cal. Civil Code section 56.36, and actual damages suffered, according to proof,

for each violation paragraph (2) of subdivision (b) of under Cal. Civil Code section 56.36.

191.    Defendants, through inadequate security, allowed unauthorized third-party access to Plaintiffs and each Class member's medical information, without the prior written authorization of Plaintiffs and the Class members, as required by Civil Code § 56.10 of the CMIA.

192.    In violation of Civil Code § 56.10(a), Defendants disclosed Plaintiffs and the Class members' medical information without first obtaining an authorization. Plaintiffs and the Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.10(a).

193.    In violation of Civil Code § 56.10(e), Defendants further disclosed Plaintiffs and the Class members' medical information to persons or entities not engaged in providing direct health care services to Plaintiffs or the Class members or their providers of health care or health care service plans or insurers or self-insured employers.

194.    Defendants violated Civil Code § 56.101 of the CMIA through their failure to maintain and preserve the confidentiality of the medical information of Plaintiffs and the Class.

195.    In violation of Civil Code § 56.101(a), Defendants created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiffs and the Class members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiffs and the

Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.101(a).

196.    In violation of Civil Code § 56.101(a), Defendants negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiffs and the Class members' medical information. Plaintiffs and the Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.101(a).

197.    Plaintiffs and the Class members' medical information that was the subject of the Data Breach included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

198.    In violation of Civil Code § 56.101(b)(1)(A), Defendants' electronic health record system or electronic medical record system failed to protect and preserve the integrity of electronic medical information. Plaintiffs and the Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code §56.101(b)(1)(A).

199.    Defendants violated Civil Code § 56.36 of the CMIA through their failure to maintain and preserve the confidentiality of the medical information of Plaintiffs and the Class.

200.    As a result of Defendants' above-described conduct, Plaintiffs and the Class have suffered damages from the unauthorized disclosure and release of their individual identifiable "medical information" made unlawful by Civil Code §§ 56.10, 56.101, 56.36.

201.    As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and the Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the California CMIA, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

202.    Plaintiffs, individually and for each member of the Class, seek nominal damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each Class member, and attorneys' fees, litigation expenses and court costs, pursuant to Civil Code § 56.35.

### Fifth Claim for Relief
**Violation of California's Unfair Competition Law Cal. Bus. Code § 17200, *et seq.***
**(On behalf of Plaintiffs and the Nationwide Class)**

203.   Plaintiffs incorporate all previous paragraphs as if fully set forth below.

204.   Defendants engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

205.   Defendants' conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, et seq. (the "CCPA"), and other above-described California statutes.

206.   Defendants stored the PHI and PII of Plaintiffs and the Class in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiffs and the Class's PHI and PII secure and prevented the loss or misuse of that PHI and PII.

207.   Defendants failed to disclose to Plaintiffs and the Class that their PHI and PII was not secure. However, Plaintiffs and the Class were entitled to assume, and did assume, that Defendants had secured their PHI and PII. At no time were Plaintiffs and the Class on notice that their PHI and PII was not secure, which Defendants had a duty to disclose.

208.    Defendants also violated California Civil Code § 1798.150 by failing to employ reasonable security measures, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiffs and the Class's PHI and PII.

209.    Defendants' decisions regarding data security, including those leading to the Data Breach, were made in California as California is the state where defendants headquarter their operations.

210.    Had Defendants complied with these requirements, Plaintiffs and the Class would not have suffered the damages related to the data breach.

211.    Defendants' conduct was unlawful, in that it violated the Consumer Records Act.

212.    Defendants' conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

213.    Defendants' conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PHI and PII.

214. Defendants also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that all individuals have a right of privacy in information pertaining to them.  The increasing use of computers has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the

intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendants' acts and omissions thus amount to a violation of the law.

215.     Instead, Defendants made the PHI and PII of Plaintiffs and the Class accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiffs and the Class to an impending risk of identity theft. Additionally, Defendants' conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

216.     As a result of those unlawful and unfair business practices, Plaintiffs and the Class suffered an injury-in-fact and have lost money or property.

217.     The injuries to Plaintiffs and the Class greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

218.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the misconduct alleged in this complaint.

219.     Therefore, Plaintiffs and the Class are entitled to equitable relief, including restitution of all monies paid to or received by Defendants; disgorgement of all profits accruing to Defendants because of their unfair and improper business practices; a permanent injunction enjoining Defendants' unlawful and unfair business activities; and any other equitable relief the Court deems proper. Further, Plaintiffs demand injunctive relief requiring Defendants to improve their cybersecurity practices to meet industry standards and those required by law,

including under common law, as the class's PII remains in Defendants' possession while Defendants have failed to implement the security measures needed to protect it.

## PRAYER FOR RELIEF

Plaintiffs and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

D.    Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen Sensitive Information;

E.    Awarding Plaintiffs and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.    Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.    Granting such other or further relief as may be appropriate under the circumstances.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: October 23, 2024                    Respectfully Submitted,

By: /s/ *Daniel Srourian*
    Daniel Z. Srourian
    SROURIAN LAW FIRM
    3435 Wilshire Boulevard, Suite 1710
    Los Angeles, CA 90010
    Telephone: (213) 474-3800
    Facsimile: (213) 471-4160
    daniel@slfla.com

    Patrick N. Keegan
    KEEGAN AND BAKER LLP
    2292 Faraday Avenue Suite 100
    Carlsbad, CA 92009
    Telephone: (760) 929-9303
    Facsimile: (760) 929-9260
    pkeegan@keeganbaker.com

    Raina C. Borrelli
    STRAUSS BORRELLI PLLC
    980 N. Michigan Ave., Ste. 1610
    Chicago, Illinois 60611
    raina@straussborrelli.com

Melissa R. Emert
KANTROWITZ GOLDHAMER AND GRAIFMAN PC
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Telephone: (845) 356-2570
memert@kgglaw.com

M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
CLAYEO C. ARNOLD
A PROFESSIONAL CORPORATION
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Fax: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

John J. Nelson (SBN 317598)
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
jnelson@milberg.com

*Attorneys for Plaintiffs and the Proposed Class*